G9niazzh ag                    HEARING

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4        v.                           02 Cr. 1446 KMK

 5   PAUL AZZARA,

 6            Defendant.

 7   ------------------------------x

 8                              September 23, 2016
                                2:15 p.m.
 9                              White Plains, N.Y.

10   Before:

11                  HON. KENNETH M. KARAS,

12                              District Judge

13                  APPEARANCES

14
     PREE BHARARA
15       United States Attorney for the
         Southern District of New York
16   MAURENE COMEY
     MICHAEL MAIMIN
17       Assistant United States Attorneys

18   STEPHEN LEWIS
         Attorney for Defendant
19

20   JASON LERMAN, USPO

21

22
                  VIOLATION OF SUPERVISED RELEASE
23

24

25

1                (Defendant not present)

2                THE COURTROOM DEPUTY:  United States v. Paul Azzara.

3    02 Cr. 1446.  Will counsel please state their appearance.

4                MS COMEY:  Maurene Comey and Michael Maimin for the

5    government.

6                MR. LEWIS:  Stephen Lewis for Mr. Azzara.

7                MS COMEY:  With us at counsel table is Jason Lerman

8    from Probation.

9                THE COURT:  Good afternoon.

10               MR. LEWIS:  I don't know why --

11               THE COURT:  That's why we're out here.  Please have a

12   seat.  When was the last time you were with Mr. Azzara?

13               MR. LEWIS:  Today until around noontime.

14               THE COURT:  I think you're aware when he was brought

15   here this morning there was an issue about clothing.

16               MR. LEWIS:  I am aware of that.

17               THE COURT:  And my understanding is that your client

18   did not want to appear for this hearing in the prison issue

19   clothing.

20               MR. LEWIS:  Right.

21               THE COURT:  And that he, in fact, tore off the

22   clothing.  I think literally like ripped it.

23               MR. LEWIS:  The pants.

24               THE COURT:  Yes, the pants.  So the marshals have

25   called up to report that he does not want to appear in his

1    undergarments and they were trying to apparently resuscitate

2    the pants that he ripped up.  But he's refusing to wear them.

3    There are more serious issues to deal with.  I don't want to

4    put your client in a difficult situation.  I don't know what

5    solutions you have to suggest to this.

6            MR. LEWIS:  Judge, I met with him while he was in a

7    pair of boxer shorts and a T-shirt which frankly was nothing

8    that was revealing or suggestive.  When I left him it was our

9    understanding he was going to appear in court.

10           THE COURT:  He doesn't want to appear that way in

11   court.

12           MR. LEWIS:  May I ask for a five-minute recess to talk

13   to him to verify that information.  Because that's different

14   from what we finally had agreed upon.

15           THE COURT:  That's why I came out here knowing he

16   wasn't here.  I don't want to do anything substantive in his

17   absence.  I was hoping to solicit your help on this.

18           MR. LEWIS:  You know I'm a specialist in getting

19   people to appear in court in their underwear.

20           THE COURT:  I know you're a specialist in a lot of

21   things.  I'll give you your five minutes.

22           MR. LEWIS:  I'm going to run downstairs.

23           (Recess)

24           THE COURT:  Mr. Lewis.

25           MR. LEWIS:  Yes, thank you, your Honor.  I think I

1    need your assistance and intervention.  Mr. Johnson, Ed

2    Johnson, from the Probation Department was kind enough to

3    indicate that he would look for a pair of pants for me over in

4    Probation.

5         THE COURT:  He's giving me the thumbs up.  I guess he

6    found a pair.

7         MR. LEWIS:  However, on the way down in the elevator

8    with him we were notified that the Marshal's Service is taking

9    the position that he either wears orange or they're going to

10   seek a force order to put orange pants on him.  And this seems

11   really silly to me.  He can wear a pair of sweatpants.  He'll

12   have ankle bracelets on the entire time he's in court if

13   they're concerned about him fleeing.  All this is doing is

14   adding gasoline to the fire.

15        THE COURT:  Can I get your permission to make a phone

16   call to the marshals?

17        MR. LEWIS:  Of course.

18        THE COURT:  Okay with that, government?

19        MS COMEY:  Yes.  We would defer to the marshals.

20        (Recess)

21        (Proceeding reconvened with the defendant present)

22        MR. LEWIS:  Stephen Lewis as CJA counsel for Paul

23   Azzara who is with me today to my left.

24        THE COURT:  Good afternoon to you both.  Thank you

25   again Mr. Lewis, thank you to the Probation Office for

1    interceding so we're able to resolve the sartorial challenges

2    of this case.  Ready to go forward with witness testimony?

3    Unless there's any preliminary matters.

4              MR. LEWIS:  Before we proceed, Mr. Azzara has asked me

5    to make two applications to the Court.  The first one is that

6    the petition that is currently filed before your Honor be

7    dismissed in light of the fact that this Court, in Mr. Azzara's

8    opinion, does not have jurisdiction because there is no

9    transfer order that has been entered from the sentencing judge,

10   Judge~McMahon, to your Honor in this matter.  Judge~McMahon is

11   a sitting justice, she's the chief justice of the Southern

12   District, she's sitting in the Southern District and she has

13   heard all of Mr. Azzara's post conviction applications that

14   have been made.  She's ruled on them.  And I'm unaware of any

15   indication that Judge~McMahon has recused herself.  And the

16   concern is that your Honor was cherry-picked for purposes of

17   this proceeding and that there's been no protocol for purposes

18   of your Honor's deciding the supervised release application

19   that's been filed.

20             THE COURT:  Who was the agent of the cherry-picking.

21             MR. LEWIS:  Mr. Johnson, Mr. Edward Johnson from the

22   Probation Department.

23             THE COURT:  Mr. Johnson assigns cases to judges?

24             MR. LEWIS:  Apparently, in the discovery material that

25   I have, there is a notation specifically that on September 15

1   that Mr. Jason Lerman received a call from Brian O'Sullivan

2   from the marshal --

3            MS COMEY:  What's the Bates number?

4            MR. LEWIS:  3501-0009.  I believe you've been provided

5   with a book from the government.  Middle of the page.

6            MS COMEY:  This is 3500 material that was provided for

7   one of the government's witnesses.

8            THE COURT:  What is it?

9            MS COMEY:  It's the electronic case file for

10  Mr. Azzara and it contains statements, written statements by

11  our first witness, probation officer Lerman.

12           MR. LEWIS:  That are reported as part of the business

13  record of the Department of Probation.  And it says that the

14  marshal, Brian, who I believe to be Brian O'Sullivan, advised

15  the senior United States Probation Officer Ed Johnson that Ed

16  Johnson is trying to get United States District Court Judge

17  Karas assigned to the case.  So that's my good-faith basis,

18  that's Mr. Azzara's good-faith basis for the application that

19  I'm currently making.

20           THE COURT:  Okay.  You said there were two

21  applications.

22           MR. LEWIS:  The second application is, was it

23  yesterday or the day before when we were here?

24           THE COURT:  We were here on Tuesday.

25           MR. LEWIS:  When we were here on Tuesday, we were

1  provided with an application for the arrest warrant.  Once

2  again it was from Mr. Johnson.  And that particular application

3  is found at 67 of the discovery materials.

4         MS COMEY:  I don't believe you have a copy of the full

5  discovery.  I'm happy to hand up a copy of the document that

6  defense counsel is referring to.

7         MR. LEWIS:  Actually, I think it's 68.  And I'll just

8  read this.  It says nature of noncompliance and it says:

9  Following a sentence by Honorable Colleen McMahon he sent the

10  letter attached to her chambers at the time in White Plains,

11  New York which threatened her.  Now, that letter that is the

12  subject of that sentence I have received a copy of and so has

13  your Honor and there was some discussion about that.  It is a

14  horrible, terrible letter.  And your Honor indicated that in

15  fact you were going to seal it but include it as part of this

16  record.  I'm asking that that not be included and the reason

17  I'm asking for that is, number one, the government will concede

18  right now that that letter was never --

19         THE COURT:  That was clear on Tuesday.

20         MR. LEWIS:  And there truly is an issue, because

21  Mr. Azzara was never charged with that, the creation of that

22  letter by the FBI back nine and a half years ago, that that

23  should be part of this record because it is so prejudicial.

24  And if there is any appellate review of this, the Second

25  Circuit, once they look at that, I don't believe they will be

1    able to divorce themselves from what is in that letter.  For

2    that reason I'm asking that it not be part of the record.

3        THE COURT:  A couple of things.  First of all, with

4    respect to jurisdiction, the application is denied.  The docket

5    reflects a reassignment of the case from Judge McMahon to

6    myself.  So I have the case.  To be clear, with all due respect

7    to Mr. Johnson, and I don't know what that note reflects, he

8    doesn't get to decide who gets assigned cases in the district.

9    Period.  Period.  It never happens that way.  Just like you

10   don't, just like Ms Comey doesn't.  This was a case that got

11   reassigned to me from the Chief Judge who also happens to be in

12   charge of the reassignment committee.  Whatever reasons led to

13   her not being in charge of the case anymore I don't have any

14   privy over.  I don't get to veto what case is assigned to me.

15   I have the case, assigned to me by the Chief Judge.  I don't

16   know how to explain that note, why Mr. Johnson thinks he can

17   get me or any other judge assigned to the case, but the answer

18   is that does not happen.

19       With respect to the letter, as I said, it was pretty

20   clear to everybody on Tuesday that the letter was not sent, and

21   that was a mistake.  That was in the report.  What was

22   proffered was that the letter was something that was found in

23   Mr. Azzara's cell.  It is signed by somebody purporting to use

24   that name.  And it does talk about Mr. Azzara's case as it

25   existed before Judge~McMahon.  And it was relevant in my view

1    to the question of bail.

2            With respect to the prejudice, it's undue prejudice.

3    And I have more faith in the Second Circuit than I guess

4    Mr. Azzara does just as I have faith in any judicial officer to

5    evaluate evidence effectively and decide the relevance of

6    evidence and the importance of any evidence regardless of how

7    inflammatory the evidence might or might not be.  That's why

8    that letter needs to be part of the record because in case

9    there was any review of the Court's decision to remand

10   Mr. Azzara, anybody reviewing it would need to know what the

11   basis was of the ruling.  To the extent that there are

12   arguments to be made about the *bona fides* of the letter, those

13   were not made to me on Tuesday and to the extent there still

14   could be arguments, that might go to the weight of the evidence

15   but it doesn't go to it being stricken from the record.

16           THE DEFENDANT:  May I add to the argument please,

17   because I requested that the application be made.

18           THE COURT:  You have a lawyer who represents you.  You

19   can have him make arguments on your behalf.  The reason, I

20   said -- we talked about this before -- is anything you say can

21   be recorded and used against you in this or any other

22   proceeding.

23           THE DEFENDANT:  I'm aware of that.  I'd still like to

24   add to the record please.

25           MR. LEWIS:  Just for the record, it is my advice to

1    Mr. Azzara that he allow me, if I'm his lawyer, to make all

2    applications and colloquy with the Court and that he not act

3    *pro se*.

4            THE COURT:  That is sound advice coming from a lawyer

5    who is quite experienced and quite effective and there really

6    isn't any downside to having a trained advocate advocate for

7    you, Mr. Azzara.  He's a very capable lawyer.  He has tried

8    cases in front of me.  It's really important that you

9    seriously, seriously consider the advantages to having

10   Mr. Lewis do his job on your behalf and seriously, seriously

11   consider the disadvantages to you of speaking in court where

12   there's a court reporter, the prosecutor and other people here.

13   Okay.  You understand that?

14           THE DEFENDANT:  Yes, your Honor.  In Azzara v.

15   Martinez, United States District Court for the Middle District

16   of Pennsylvania for the Honorable William J. Nealon I filed a

17   2251 based upon that letter and the failed prosecution.  It has

18   to do with two confidential informants who created the letter,

19   planted it in my cell and told SIS where that letter could be

20   found.  I did not write that letter.  This is all documented in

21   United States District Court for the Middle District of

22   Pennsylvania in Azzara v. Martinez, the facts surrounding that

23   letter.  Therefore, to include as part of the record a letter

24   which I adamantly deny ever drafting and in fact challenged

25   this eight years ago before I knew of any of these proceedings

G9niazzh ag                    HEARING

1    is once again highly prejudicial and irrelevant to these

2    proceedings.

3            THE COURT:  Like I said, Mr. Azzara, it doesn't make

4    the letter irrelevant.  It may mean that you think the letter

5    doesn't --

6            THE DEFENDANT:  I --

7            THE COURT:  Please do not interrupt me, sir.  I have

8    shown you all the courtesy in the world and I will never

9    interrupt you and I won't let anybody else interrupt you.

10           THE DEFENDANT:  I apologize.

11           THE COURT:  All right.  The relevance of the document

12   isn't defined by your view that it wasn't written by you.

13   Okay.  The significance of the letter is something that can

14   very well be the subject of further discussion.  But I have

15   different versions of the *bona fides* of that letter and my view

16   is it's relevant.  It's not unduly prejudicial and of course if

17   the moment comes where the letter continues to be relevant and

18   it's going to be contested you can put forth any letter, have

19   Mr. Lewis put forth evidence on your behalf.  I don't know

20   anything about the other case.  And there's nothing else to be

21   said on that.  I'm not going to strike this from the record.

22           Any other issues, Mr. Lewis?

23           (Counsel consults with his client).

24           MR. LEWIS:  Judge, I'm prepared to proceed.

25           THE COURT:  Anything the government wants to take up

1    before we start.

2              MS COMEY:  No, your Honor, we're prepared to call our

3    first witness.  Probation officer Jason Lerman.

4     JASON LERMAN,

5          called as a witness by the Government,

6          having been placed under oath, testified as follows:

7    DIRECT EXAMINATION

8    BY MS COMEY:

9    Q.  Good afternoon.

10   A.  Good afternoon.

11   Q.  Where do you work?

12   A.  United States Probation Office in White Plains.

13   Q.  What's your title?

14   A.  U.S. probation officer.

15   Q.  How long have you been a U.S. probation officer?

16   A.  Since January 2016.

17   Q.  Where were you employed before that?

18   A.  U.S. Pretrial Services.

19   Q.  In which district?

20   A.  Southern District of New York.

21   Q.  For how long were you employed by Pretrial Services?

22   A.  18 years.

23   Q.  What was your title there?

24   A.  U.S. Pretrial Services Officer.

25   Q.  As a probation officer, generally what are your

g9niazzh ag                    Lerman – direct

1   responsibilities?

2   A.  I supervise people who are placed on probation and

3   supervised release.

4   Q.  At some point were you assigned to supervise an individual

5   named Paul Azzara?

6   A.  Yes.

7   Q.  About when did you receive that assignment?

8   A.  That was about July 2016.

9   Q.  And when was Mr. Azzara scheduled to be released from

10  custody?

11  A.  September 16, 2016.

12  Q.  Prior to September 16, 2016 what was your understanding of

13  where Mr. Azzara was planning to reside when he was released?

14  A.  He was going to reside in Rockland County with his father.

15          MR. LEWIS:  Objection.  Foundation.

16          THE COURT:  What's the basis for that statement,

17  officer?

18  Q.  How did you know that he was going to reside there?

19  A.  The Probation Department received a letter from the Bureau

20  of Prisons asking us to conduct a prerelease investigation and

21  that was the residence that was given to us.

22  Q.  What's a prerelease investigation?

23          MR. LEWIS:  Objection.  Your Honor, I haven't received

24  that document as part of the discovery in this case.  If such a

25  document exists, I ask that it be turned over.

1          THE COURT:  Is there a way to get the document?

2     A.   Yes.

3          THE COURT:  Can one of your colleagues get it for you?

4     It looks like the answer is yes.  Somebody stood up to get it.

5          All right, Mr. Lewis, we'll try to get you the

6     document.

7          MS COMEY:  Would you like me to proceed?

8          THE COURT:  We can proceed.

9     Q.   After receiving that document, what process did you go

10    through?

11    A.   Our office goes to the residence to do a home inspection to

12    make sure it's an appropriate residence.

13    Q.   And was that process carried out in this case for

14    Mr. Azzara?

15    A.   Yes, it was.

16    Q.   And was that residence approved?

17    A.   Yes, it was.

18    Q.   Did you speak with Mr. Azzara's father regarding the plan

19    for his son to reside with him?

20    A.   Yes, I did.

21    Q.   When was that?

22    A.   That was I believe September 8, 2016.

23    Q.   What did you discuss?

24    A.   We discussed the fact that he was still okay with

25    Mr. Azzara residing with him at his residence.  He said that he

g9niazzh ag                    Lerman - direct

1    was, and that they are still on good terms, and that he was

2    looking forward to him getting out on the 16th of September.

3    Q.  At that point where did you --

4              THE COURT:  I believe Mr. Azzara's father is in the

5    courtroom.  Do you anticipate calling him as a witness?

6              MR. LEWIS:  No, your Honor.

7              THE COURT:  All right.

8    Q.  At that point in time, around September 2016, where did you

9    want Mr. Azzara to report to Probation upon his release?

10   A.  To the White Plains office.

11   Q.  How did you attempt to communicate that desire that he

12   report to the White Plains office to the institution where

13   Mr. Azzara was being held?

14   A.  I made a couple of phone calls, attempts to reach out to

15   his case manager as well as e-mails.  Unfortunately, I was not

16   able to speak with her directly before his release but I spoke

17   with a manager there by the name of Mr. Page.

18   Q.  Just so we're clear, where was Mr. Azzara being held at

19   this time?

20   A.  This was at the MDC in Brooklyn.

21   Q.  You mentioned getting in touch with Mr. Page.  When was

22   that?

23   A.  That was on the morning of September 16, 2016.

24   Q.  Did you actually speak with Mr. Page?

25   A.  Yes, I did.

g9niazzh ag                    Lerman - direct

1   Q.  What did you learn from Mr. Page about what Mr. Azzara's

2   plans were for where he was going to go when he was released?

3            MR. LEWIS:  Objection.

4            THE COURT:  Overruled.

5   A.  Mr. Page advised me that Mr. Azzara was planning to reside

6   in a homeless shelter in lower Manhattan.

7   Q.  How did you react to hearing that?

8   A.  I said that's not correct.  He needs to report to my office

9   in White Plains upon his release.

10  Q.  What happened next?

11  A.  I asked Mr. Page if I'd be able to speak to Mr. Azzara

12  directly.

13  Q.  And how did he respond?

14  A.  He said that he would get Mr. Azzara, and that he would

15  call me back once he was back.

16  Q.  What happened after that call?

17  A.  I received a call from Mr. Page with Mr. Azzara in his

18  office.  I identified myself to Mr. Azzara who I was.

19  Q.  Just so we're clear, who were you speaking to on the phone

20  at this point?

21  A.  Mr. Page put Mr. Azzara on the phone.

22  Q.  So Mr. Page called you and then he put Mr. Azzara on the

23  phone?

24  A.  Correct.

25  Q.  Where was Mr. Page calling you from?

g9niazzh ag                    Lerman - direct

A.   The MDC in Brooklyn.

Q.   At this point was Mr. Azzara still in Bureau of Prisons

custody?

A.   Yes.

Q.   So when Mr. Azzara came on the phone, what did you tell

him?

A.   I identified myself to Mr. Azzara, who I was, I told him I

was his probation officer, and that upon his release I need him

to report to my office in White Plains.

Q.   How did Mr. Azzara respond?

A.   He was argumentative.  He advised me that he had 72 hours

by statute to report to the Probation Office upon his release.

He advised me that he was not living in Rockland County, that

he was going to be residing at a homeless shelter in lower

Manhattan, and he was going to be reporting to the office in

Manhattan, the Probation Office in Manhattan.

Q.   How did you respond to Mr. Azzara's statement?

A.   I said that you are not approved to reside in Manhattan.  I

advised him that he was approved to reside in Rockland County

with his father and I'm his assigned probation officer and he

needs to report to my office.

Q.   How did Mr. Azzara respond?

A.   He was again argumentative.

          MR. LEWIS:  Objection.

          THE COURT:  Overruled.

g9niazzh ag                    Lerman - direct

1   A.  He was again argumentative.  I explained to him again I was

2   his assigned officer.  And I asked him that he needs to call me

3   upon his release from when he's getting out from the MDC so I

4   know roughly when I could expect him.

5   Q.  Just so we're clear, specifically when did you instruct

6   Mr. Azzara to appear before you, what day did you want him to

7   show up?

8   A.  It was Friday, September 16, 2016.

9   Q.  On that call you explicitly told him to report to White

10  Plains that day?

11  A.  Yes, I did.

12  Q.  How did the conversation end?

13  A.  He was not happy.

14          MR. LEWIS:  Objection.

15          THE COURT:  You're going to have to explain why you

16  think that.

17  A.  Based on the fact that he was still argumentive about

18  reporting to the White Plains office.

19  Q.  You could tell us specifically what he said if it helps.

20  A.  I don't recall his exact words.  He was just not happy --

21          MR. LEWIS:  Objection.

22          THE COURT:  Was there something about what he said or

23  how he said it that leads you to say he was not happy?

24  A.  He kept going back to the fact that he was going to reside

25  in lower Manhattan in the homeless shelter and his case was

1  going to be supervised out of the Manhattan office and not the

2  White Plains office.

3  Q.  How did the conversation end after he made all of these

4  statements?

5  A.  I told him to call me before he is released and then he

6  said okay.

7  Q.  Did Mr. Azzara call you?

8  A.  No, he did not.

9  Q.  Had you provided him your phone number during that phone

10  call?

11  A.  Yes, I did.

12  Q.  And Mr. Azzara, did he call you that day?

13  A.  No, he did not.

14  Q.  Did he report to Probation that day?

15  A.  No.

16  Q.  When did Mr. Azzara report to Probation?

17  A.  I reported to Probation on Monday, September 1, 2016.

18  Q.  What office did he report to?

19  A.  To the Manhattan office.

20  Q.  Between the conversation you had with Mr. Azzara on Friday

21  the 16th and his reporting to Probation on Monday the 19th, did

22  you attempt to locate Mr. Azzara?

23  A.  I did.

24  Q.  How did you go about doing that?

25  A.  I contacted the shelter where he said he was going to be

1  residing at.  And they advised me that he had -- they have no

2  person by that name.

3          MR. LEWIS:  Objection.

4          THE COURT:  Overruled.  Go ahead.

5  A.  And they advised me that they have no person at the shelter

6  by that name.

7  Q.  How many times did you call the shelter?

8  A.  Twice.

9  Q.  How did you learn that Mr. Azzara had reported to Probation

10  on Monday, September 19th in Manhattan?

11  A.  I received an e-mail from Jennifer Arango who works in the

12  Manhattan office.

13  Q.  Is she an employee of U.S. Probation?

14  A.  Yes, she is.

15  Q.  How did you react when you learned that Mr. Azzara had

16  reported to Manhattan against your instructions?

17  A.  Well, I was disappointed.  I read through the chrono that

18  she entered and I saw that he now has a cellphone number.  I

19  called the cellphone number and spoke to him directly and again

20  advised him to report to my office in White Plains, I advised

21  him to report to my office on September 20, 2016, eleven a.m.

22  Q.  When did this call take place?

23  A.  This was on Monday, September 19.

24  Q.  And did you identify yourself to Mr. Azzara?

25  A.  Yes, I did.

1  Q.  How did you identify yourself?

2  A.  I said I'm his assigned probation officer.  I told him my

3  name.  And I told him to report to me in White Plains on

4  September 20 at eleven a.m.

5  Q.  How did Mr. Azzara respond to that instruction?

6  A.  Was again argumentative.  He told me he reported to the

7  Manhattan office.  And he didn't need to report to White Plains

8  since he's residing at the homeless shelter in Manhattan.

9  Q.  What did you say in response?

10  A.  I told him that I was his assigned probation officer and

11  that he needed to report to my office on September 20, 2016 at

12  eleven a.m.

13  Q.  How did that call end?

14  A.  It ended -- I said to Mr. Azzara that if he did not report

15  to my office in White Plains, that we were going to seek a

16  warrant for his arrest.

17  Q.  How did he respond to that?

18  A.  He advised, fine, and he would show up with his attorney.

19  Q.  And was that the end of the call?

20  A.  Yes.

21  Q.  At any point during the call did Mr. Azzara indicate that

22  he didn't know where the White Plains office was?

23  A.  No.

24  Q.  At any point during the call did Mr. Azzara indicate that

25  he was unable to get to the White Plains office?

1    A.  No.

2    Q.  Did Mr. Azzara report to the White Plains office the next

3    day?

4    A.  No, he did not.

5    Q.  What did he do?

6    A.  He reported to the Manhattan office again.

7    Q.  At some point did you learn where Mr. Azzara had been on

8    the morning of September 20th before he reported to Manhattan?

9    A.  Yes, I did.

10   Q.  How did you learn that?

11   A.  I received a phone call from his father inquiring what the

12   status of Mr. Azzara is, he heard that he was arrested and is

13   back in jail.  And I explained to him yes, he was arrested this

14   morning and he's going to be having a hearing in court this

15   afternoon.

16   Q.  What did you learn with respect to where Mr. Azzara had

17   been before he reported to Probation that morning?

18   A.  His father told me that Mr. Azzara was actually in his

19   residence in Rockland County that morning.

20   Q.  In your experience is it easier to travel to White Plains

21   or to Manhattan from Rockland County?

22            MR. LEWIS:  Objection.

23            THE COURT:  He can answer that.

24   A.  White Plains.

25            MS COMEY:  I have no further questions.

g9niazzh ag                    Lerman - cross

1              THE COURT:  Do you have the document?

2              Mr. Lewis, I think we have the document you requested.

3              MS COMEY:  Handing a copy to defense counsel and I

4    have an extra copy to hand up to your Honor.

5              (Handed to the Court)

6    CROSS EXAMINATION

7    BY MR. LEWIS:

8    Q.  Mr. Lerman, good afternoon.

9    A.  Good afternoon, Mr. Lewis.

10   Q.  Mr. Lerman, I'm going to show you what I've marked as

11   Defendant's Exhibit A which is part of the discovery in this

12   case marked PA077.

13             (Handed to the witness)

14   Q.  Is this the document that you referenced earlier indicating

15   that you had received reflecting that Mr. Azzara was going to

16   be residing in a men's shelter in New York City?

17             MS COMEY:  Objection, your Honor.  I don't believe

18   that the witness testified that he had ever received the

19   document reflecting that defendant was going to be in New York

20   City.  I believe he testified that he received a document that

21   he was going to live with his father in Rockland and that he on

22   a phone call learned that he was going to live in a men's

23   shelter.

24             THE COURT:  The record speaks for itself.  That is

25   what I think the testimony was.  Ask away, Mr. Lewis.

1          MR. LEWIS:  This is the document that the AUSA just

2     handed to me, at least the front page, in response to the

3     inquiry as to the document that indicated that he was going to

4     be living in Rockland County.

5          MS COMEY:  Your Honor, that's not the document that I

6     just handed to Mr. Lewis.

7          MR. LEWIS:  It isn't?

8          MS COMEY:  No.  This is the document.

9          (Counsel consult)

10         MR. LEWIS:  I'm incorrect.

11    Q.  Looking at Defendant's Exhibit A, when was the first time

12    you saw this document?

13    A.  I don't recall seeing this document.

14         THE COURT:  Ever?  You've never seen this document

15    before you were just shown it?

16    A.  Correct.

17    Q.  Mr. Lerman, when an individual is released from prison are

18    you familiar with a document known as a release and arrival

19    form?

20    A.  Yes.

21    Q.  And that's handed to the probation officer when they

22    report, correct?

23    A.  I'm sorry.  If this is handed to the probation officer when

24    they report?

25    Q.  When an individual is released from prison and he's

1    directed to appear and report to a probation officer, he needs

2    to provide them with a notice of release and arrival, isn't

3    that true?

4    A.  Mr. Lewis, I'm not familiar with that.  Because when I see

5    an individual, they usually don't have any paperwork for me.

6    Maybe that's done in the Manhattan office at the intake

7    process.

8           MS COMEY:  Your Honor, I may be able to clear this up.

9    The document that Mr. Lewis has handed up is one that we

10   received from the Bureau of Prisons.  We did not receive this

11   from the Department of Probation.

12          THE COURT:  Okay.

13   Q.  As part of the intake process, Probation requires some sort

14   of notification as to where the individual is going to be

15   residing, correct?

16          MS COMEY:  Objection.  Foundation.

17          THE COURT:  If he knows.  Do you know?

18   A.  Would you repeat the question.

19   Q.  As part of the intake process at the Department of

20   Probation, is it customary to receive some documentation from

21   the prison that the man was just released from?

22   A.  It's possible.  I don't know for sure.

23   Q.  You are familiar with the fact that an individual when he

24   is released from prison has 72 hours to report to a probation

25   officer?  Is that right?

1    A.  Yes.

2    Q.  If in fact he's not in the district, the appropriate

3    district, to report in the nearest district, isn't that right?

4    A.  Possible, yes.

5    Q.  Now, have you ever signed -- withdrawn.  Is it customary

6    that when a probationer or a person who is going to be on

7    supervised release reports for the first time to the Probation

8    Department that they in fact have the probationer or the person

9    that is going to be on supervised release go over conditions of

10   probation and supervised release?

11   A.  Yes.

12   Q.  Was that done in this particular case?

13   A.  I don't know for sure.

14   Q.  Have you ever seen conditions of probation and supervised

15   release in reviewing for today's testimony on this case,

16   Mr. Azzara's?

17   A.  Yes, I did, yes.

18   Q.  So it was done, right?

19   A.  Yes.

20   Q.  And in fact, Government's Exhibit 1 is in fact that

21   document.  And this was prepared on what date, sir?

22   A.  September 19, 2016.

23   Q.  And it was prepared by whom?

24   A.  I can't read the person's name.

25   Q.  In reviewing for today you saw this document.  Who was it

g9niazzh ag                    Lerman - cross

1    that was the intake employee from Probation on September 19,

2    2016?

3    A.   That was Jennifer Arango.

4    Q.   And she is a Probation employee?

5    A.   Yes.

6             MR. LEWIS:  I offer this, your Honor, as Government's

7    Exhibit 1.

8             MS COMEY:  No objection, your Honor.

9             (Government's Exhibit 1 received in evidence)

10   Q.   On this document, sir, which is titled conditions of

11   probation and supervised release, does it indicate in the third

12   paragraph "the defendant shall report in person to the

13   Probation Office in the district to which you are released

14   within 72 hours of release from the custody of the Bureau of

15   Prisons (supervised release cases only)"?

16   A.   Yes.

17   Q.   Did Mr. Azzara report to Ms Arango at your Probation Office

18   located at 500 Pearl Street within 72 hours of his release?

19   A.   Yes.

20   Q.   Could you look at Exhibit , paragraph 6.  This says "the

21   defendant shall notify the probation officer ten days prior to

22   any change of residence or employment."  Is that right?

23   A.   I'm sorry, where are you reading, sir?

24   Q.   Paragraph 6 on the same page.  First page of Government's

25   Exhibit 1 which is also discovery Bates stamped 64.

1   A.   Okay.

2   Q.   That's what it says, right?  I read it correctly, I read

3   that sentence correctly?

4   A.   Yes.

5   Q.   So even the forms that you utilized in the Probation

6   Department gives him ten-days to notify you of change of

7   residence or employment, right?  Ten-day grace period.

8   A.   I don't think that you're saying what it says, Mr. Lewis.

9   Q.   It says "the defendant shall notify the probation officer

10  ten days prior to any change of residence or employment."

11  Correct?

12  A.   Correct.

13  Q.   On the second page of this document, that's Mr. Azzara's

14  signature as the releasee?

15  A.   Possibly, yes.

16  Q.   And that's Ms Arango's signature underneath it, dated

17  9/19/16.

18  A.   Possibly, yes.

19  Q.   And this also refers, does it not, to the judgment and

20  conviction, where it says -- see J&C?

21  A.   Yes.

22  Q.   And there was a judgment and conviction in this particular

23  case, correct?

24  A.   Yes.

25  Q.   And it called for three years of supervised release upon

g9niazzh ag                    Lerman - cross

1    his release from prison, correct?

2    A.   Yes.

3    Q.   And it also said, indicate again in that J&C that the

4    probationer or the releasee in this particular instance had 72

5    hours to report to the Probation Department upon his release

6    from prison, correct?

7    A.   Correct.

8    Q.   Going back to Defendant's Exhibit A, when an individual is

9    released from prison and he has to report to the probation

10   officer, is there any form or piece of paper that notifies him

11   where he's supposed to report?

12   A.   After our office does the prerelease home inspection of

13   where he was going to reside, we would send a letter back to

14   the Bureau of Prisons indicating if that residence was

15   acceptable or not acceptable.  In that letter we usually write

16   on the bottom that he is to report to the Manhattan office for

17   intake processing.

18   Q.   And that document that you say you sent where it says where

19   he's to report, do you have a copy of that document?

20   A.   I don't, no.  I do, in the file, I don't have it with me.

21            MR. LEWIS:  I'd ask for a copy of a letter that

22   indicates that he is to report to the particular address where

23   he's supposed to report.

24            THE COURT:  You want a copy of that letter, whatever

25   it says, that's what you want to look at?

1          MR. LEWIS:  Right.

2          THE COURT:  Can you get that letter?

3          MS COMEY:  I can find out, your Honor.

4          THE COURT:  All right.

5          Thank you, Mr. Johnson.

6    Q.  Mr. Lerman --

7          THE COURT:  Can we just pause for one minute.  Are

8    there other documents in this officer's file that are relevant

9    to this?

10         MS COMEY:  My understanding was that I reviewed every

11   page the file.  I was not aware of these other documents.

12         THE COURT:  Do you know where they would be?

13         THE WITNESS:  They're scanned in the computer.

14         THE COURT:  Officer Lerman, documents that you created

15   relating to this case, whether they are hard copy or digital

16   copy, you need to get those to Mr. Lewis.  The prosecutor can

17   look at them first to decide if they're not discoverable.  I'd

18   be hard-pressed to know how they would not be discoverable.

19   A.  I believe I submitted all the copies.  I can double check,

20   your Honor.

21         THE COURT:  Maybe what we do, Mr. Lewis, you finish

22   with your inquiry of this witness and maybe we can send him

23   with Mr. Maimin or somebody to make sure that all the documents

24   that he created that are in his file or otherwise are in the

25   file that are relevant to this case you make sure you get.

1   Q.  On September 16 -- withdrawn.  You indicated that you sent

2   the document to the prison where he was being held, wherever he

3   may have been, where he was incarcerated indicating that he

4   would be living in Rockland County, right?

5   A.  I did not send the letter myself.  Someone from my office,

6   did.

7   Q.  And that was Mr. Bill Pompei?

8   A.  I believe so, yes.

9   Q.  And Mr. Bill Pompei sent that letter but when you called on

10  September 16, finding out that he was going to be released, you

11  found that the discharge papers from MDC indicated that he

12  would be living at a homeless shelter located at 4551 Avenue D,

13  New York, New York, 10009, the Bowery Mission Men's Shelter,

14  right?

15  A.  We did not approve that address.

16  Q.  I didn't ask that.  You learned when you made that phone

17  call that the MDC discharge papers reflected that he was going

18  to be living at the Bowery Mission Men's Shelter in Manhattan,

19  right?

20  A.  Yes.

21  Q.  And you were concerned about that, right?

22  A.  Yes.

23  Q.  You didn't want him living in Manhattan, right?

24  A.  Correct.

25  Q.  So you in fact then contacted MDC to speak to Mr. Page

1     first, right?

2     A.   I reached out to his case manager before that.

3     Q.   And you never heard anything back, correct?

4     A.   Well, I did speak with her on one occasion.

5     Q.   You were informed, were you not, that MDC wasn't going to

6     change their paperwork prior to his discharge, right?

7     A.   I was not told that.

8     Q.   When you spoke with Mr. Page, did you ask him specifically

9     where is it that his notice of release and arrival or his

10    discharge papers reflect that he was going to be living?

11    A.   He told me he was going to the shelter but I advised him

12    that we did not approve that address.

13    Q.   So Mr. Page, the employee at MDC, told you that the papers

14    reflect that he was going to be released that day and that he

15    was going to be living at the Bowery Men's Shelter, correct?

16    A.   Yes.

17    Q.   And that's when you asked Mr. Page to get Mr. Azzara on the

18    line, that you wanted to speak to him, correct?

19    A.   Correct.

20    Q.   Going back to Defendant's Exhibit A, does this reflect,

21    this document, which is a United States Department of Justice

22    notice of release and arrival document, does it reflect the

23    Bowery Mission Men's Shelter, the address and the telephone

24    number indicated as where Mr. Azzara would be living?

25    A.   Yes.

g9niazzh ag                    Lerman - cross

1          MR. LEWIS:  I'd offer this, your Honor, at this time

2     as Defendant's Exhibit A.

3          MS COMEY:  No objection, your Honor.

4          THE COURT:  Received.

5          (Defendant's Exhibit A received in evidence)

6     Q.  So on Defendant's Exhibit A, in the first page of that

7     document, it shows the sentencing district, correct?

8     A.  Yes.

9     Q.  And it lists the address as the Daniel Patrick Moynihan

10    United States Courthouse, 500 Pearl Street, room 698, New York,

11    New York, 10007, right?

12    A.  Yes.

13    Q.  What's at room 698?

14    A.  That's our office.

15    Q.  That's the Probation Department, right?

16    A.  Yes.

17    Q.  And it's on there because that's the directive to the

18    inmate as to where he's supposed to go when he gets released,

19    correct?

20    A.  That's not what my understanding is.

21    Q.  Could you tell me anywhere on this document, his discharge

22    papers from MDC, can you tell me anywhere where it indicates

23    the address up in White Plains?

24    A.  No, it does not.

25    Q.  In fact, on the last page of the document which is again

g9niazzh ag                    Lerman - cross

1    Bates stamped 79, it says in the remarks column, "Mr. Azzara

2    has been informed he has 72 hours to report to the U.S.

3    Probation Office upon his release.  If any additional

4    information is needed please contact Ms J. Spencivy, case

5    manager, at MDC Brooklyn (718) 840-4200."  And it's dated with

6    his signature on August 14, 2006, right?

7    A.  Yes.

8              MR. LEWIS:  Your Honor, I just realized, one of the

9    government exhibits is Government's Exhibit 4 which is a part

10   of Defendant's Exhibit A.  So at this time I'd offer

11   Government's Exhibit 4 which has some additional pages.

12             MS COMEY:  No objection, your Honor.

13             (Government's Exhibit 4 received in evidence)

14   Q.  Government's Exhibit 4, the last page.  That is

15   specifically Bates stamped 83.  This indicates release plan,

16   right?

17   A.  Yes.

18   Q.  And it says "inmate Azzara has no release destination.

19   Inmate Azzara has requested to be placed in a homeless shelter

20   in New York City so that he can participate in educational

21   program and locate employment."  Do you see that?

22   A.  Yes.

23   Q.  And this is part of that same group of documents we've

24   identified as his discharge papers, right, Government's

25   Exhibit 4?

g9niazzh ag                    Lerman - cross

1    A.   Yes.

2    Q.   Now, you indicated what your responsibilities were as a

3    United States probation officer.  But your responsibilities as

4    a United States probation officer were actually set forth in --

5    withdrawn.  Your responsibilities as a United States probation

6    officer are actually codified by Congress in 18 U.S.C. 3655,

7    aren't they?  Are you familiar with that section?

8    A.   Can you show me the statute?

9    Q.   Sure.

10            (Counsel consult)

11            MR. LEWIS:  I withdraw the last question.  It appears

12   that that particular subsection has been repealed and I

13   apologize for wasting the Court's time.

14            THE COURT:  Don't worry about my time.

15   Q.   One of the responsibilities that you have as a probation

16   officer is to try to acclimate a releasee or a probationer back

17   into society, right?

18   A.   Yes.

19   Q.   You want to make sure that he has educational

20   opportunities; you want to make sure that he has employment

21   opportunities, right?

22   A.   Yes.

23   Q.   So you want to make sure that you aid them to the extent

24   that they can improve their conduct and their social condition.

25   Fair?

1   A.  Yes.

2   Q.  And you knew from review of the file that Mr. Azzara had

3   worked in New York City, right?

4   A.  I was not aware of that until recently, yes.

5   Q.  And there are job opportunities in New York City, are there

6   not?

7   A.  Possibly.

8   Q.  And you learned certainly at least on September 16 that his

9   intention was to live in and work in New York City, right?  By

10  New York City, I mean Manhattan.

11  A.  Yes.

12  Q.  You also knew, did you not, by acclimating yourself to this

13  particular probationer or releasee that he in fact had been in

14  a halfway house in Bronx County for approximately three and a

15  half months, correct?

16  A.  Yes.

17  Q.  And as part of his abilities to be in a halfway house, he

18  could work and he could travel.  There was no GPS monitoring,

19  was there?

20          MS COMEY:  Objection.

21          THE COURT:  He can answer that, if he can.

22  A.  I don't recall.

23  Q.  Did you research that?

24  A.  He was at that time under the Bureau of Prisons.  That

25  wouldn't be something that Probation was monitoring.

1    Q.  Did you ever have a conversation or a meeting with

2    Mr. Azzara prior to September, the cellphone, excuse me, the

3    telephone conversation on September 16th of this year?

4    A.  No.  That was my first conversation.

5    Q.  Now, your predecessor in this matter was Mr. Pompei,

6    correct?

7    A.  Yes.

8    Q.  And was there a directive that was ever given by Mr. Pompei

9    to Mr. Azzara that upon his release he was to report down to

10   500 Pearl Street in Manhattan?

11   A.  I don't know.

12   Q.  Did you review the file before testifying here today?

13   A.  I did.

14   Q.  I'd like to show you what's been marked as Defendant's

15   Exhibit B.  It's also Bates stamped 44.  May I approach, your

16   Honor?

17   A.  Yes.

18   Q.  Is that a letter from Mr. Pompei to United States Prison

19   Coleman in Florida?

20   A.  Yes.

21   Q.  And it's sent to case manager Rosinule, correct?

22   A.  Yes.

23   Q.  And it concerns Paul Azzara, right?

24   A.  Correct.

25   Q.  And the date on this is November 2, 2015, right?

1    A.  Yes.

2                MR. LEWIS:  I'd offer this, your Honor.

3                MS COMEY:  No objection.

4                (Defendant's Exhibit B received in evidence)

5    Q.  Could you read to the Court the second paragraph of this

6    letter dated November 2, 2015 from probation officer Bill

7    Pompei to Mr. Azzara's case manager?

8    A.  "Upon release from the Bureau of Prisons, please advise

9    Mr. Azzara to report to 500 Pearl Street, sixth floor, New

10   York, New York, 10007 within 72 hours for intake processing by

11   the Southern District of New York, U.S. Probation Office."

12   Q.  Now, when you spoke to Mr. Page on the 16th and learned

13   that he was going to be released to a homeless shelter in New

14   York City, you were concerned enough to ask to speak directly

15   to Mr. Azzara for the first time.  Right?

16   A.  Yes.

17   Q.  And that's when you told him that you wanted him to report

18   that same day to your office.

19   A.  Correct.

20   Q.  Do you know what time he was released on the 16th?

21   A.  I know it was after twelve noon.

22   Q.  And what time do you leave your office?

23   A.  That day I was there until five.

24   Q.  Do you normally leave at four?

25   A.  My schedule is flexible.

g9niazzh ag                    Lerman - cross

1    Q.  I do accept that there's flexibility but is there a

2    customary hour that you come in and customary hour that you

3    leave?

4    A.  I usually come into the office around, between 8, 8:30.

5    Q.  And leave?

6    A.  Between four and five.

7    Q.  You said that Mr. Azzara was quote unquote argumentative.

8    Do you remember testifying to that a few minutes ago?

9    A.  Yes.

10   Q.  Well, did he curse at you?

11   A.  No.

12   Q.  Did he threaten you in any fashion?

13   A.  No.

14   Q.  He advocated that he did not have to report today, the day

15   of his release, that he had 72 hours, right?

16   A.  Yes.

17   Q.  And he also told you, did he not, that he was supposed to

18   report to 500 Pearl Street by the letter sent by the Probation

19   Department directing that, correct?

20   A.  Yes.

21   Q.  You didn't want that because you were concerned about him

22   being in Manhattan, right?

23   A.  Yes.

24   Q.  Why?  Who told you to get on that phone and make sure he

25   doesn't go in Manhattan?  Who was it that directed you to do

g9niazzh ag                    Lerman - cross

1   that?

2            MS COMEY:  Objection, your Honor.

3            THE COURT:  Overruled.  You can answer.

4   A.  I've had conversations with the U.S. Marshals that were

5   concerned.

6   Q.  And those conversations were with Brian O'Sullivan?

7   A.  Yes.

8   Q.  And did Brian O'Sullivan indicate to you that the United

9   States Marshal service didn't want him in Manhattan?

10           MS COMEY:  Objection, your Honor, relevance.

11           THE COURT:  Overruled.

12  A.  That's not quite how he phrased it.

13  Q.  Didn't he tell you that he did not want Paul Azzara in

14  Manhattan because that is where Chief U.S. District Court Judge

15  MacMahon is and the marshals do not want him anywhere near her

16  Honor?  Isn't that how he said it?

17  A.  Possibly.

18  Q.  And isn't that your entry into your log on September 15th?

19  Didn't you type that entry into your log?

20  A.  Can I see that?

21  Q.  Sure.

22           (Handed to the witness)

23  Q.  I'm showing you what's been marked as 3502, page 10.  Once

24  again I'm wrong.  3501.  Mr. Maimin has my back all the time,

25  Judge.  Number 10.  Second paragraph.

1    A.  Yes.

2    Q.  That's what he told you, right?

3    A.  Yes.

4    Q.  That's the reason why everybody wanted to make sure

5    Mr. Azzara reported to White Plains, correct?

6              MS COMEY:  Objection, your Honor.

7              THE COURT:  Sustained.  That question is improper.

8    Q.  That was your understanding as to why the United States

9    Marshal and Mr. Johnson wanted you to take some action so that

10   Mr. Azzara did not report to 500 Pearl Street but in fact

11   reported to your offices in White Plains, correct?

12   A.  Yes.

13   Q.  Now, on September 19 did you receive an e-mail from

14   Jennifer Arango indicating that Mr. Azzara had reported and

15   that he'd be residing in New York and that he was directed to

16   appear to come back to 500 Pearl Street to be assigned a

17   probation officer on October 4, 2016?

18   A.  I don't know what she said to him.

19   Q.  Didn't you speak with her?

20   A.  I received her e-mail.

21   Q.  Did you ever phone her up and talk to her?

22   A.  I spoke with her, yes.

23   Q.  Would it be fair to say that in that conversation you told

24   her, no, I don't want him reporting to New York, I want to have

25   him reporting to White Plains, right?

g9niazzh ag                    Lerman - cross

1   A.  Well, I was his assigned officer.  And he was supposed to

2   report to White Plains office.

3   Q.  Did Ms Arango when she spoke to you tell you that she had

4   given him documentation on September, Monday September 19th to

5   return to the Probation Department on October 4, 2016 between

6   8:30 a.m. and 3:00 p.m. where he would receive a probation

7   officer who would be the duty officer?  Didn't she tell you

8   that?

9   A.  That was in her chronos, yes.  She didn't tell me that over

10  the phone.

11  Q.  And that's the information she told Mr. Azzara, right?

12  A.  I don't know.

13          MS COMEY:  Objection.

14          THE COURT:  Sustained.

15  Q.  I'd show you what's been marked as Defendant's Exhibit C.

16          (Handed to the witness)

17  Q.  Do you see that?  That's the document that was generated by

18  the United States Probation Office, correct?

19  A.  It appears to be, yes.

20          MR. LEWIS:  I'd offer that as Defendant's Exhibit C.

21          MS COMEY:  No objection, your Honor.

22          THE COURT:  Received.

23          (Defendant's Exhibit C received in evidence)

24  Q.  Now that document specifically says, does it not, that

25  Mr. Azzara is to report back to 500 Pearl Street on, what was

1    it, October 4th or October 5th?  I forget.

2    A.   This document says October 4th.

3    Q.   And then it says probation officer and underneath it is

4    written the word what?

5    A.   Duty officer.

6    Q.   In your stay as a probation officer since you received your

7    appointment in January 2016, have you ever served as a duty

8    officer?

9    A.   No, I have not.

10   Q.   Do you know what a duty officer is?  Can you tell the

11   Court.

12   A.   I don't know offhand, no.

13   Q.   Mr. Lerman, you don't know what a duty officer in the

14   United States Probation Office is?

15   A.   I don't know what their function is in the Manhattan

16   office, no.

17   Q.   Is there a duty officer up here in White Plains?

18   A.   No.

19   Q.   So the first time that you've ever heard of the United

20   States Probation duty officer is as you're testifying here

21   today in this courtroom, is that your testimony?

22   A.   No.  I heard of the term.

23   Q.   Okay.  And what did you understand the term to be?

24   A.   I mean I can take a guess.

25             THE COURT:  We don't want guesses.

1  Q.  When you heard the term before, in what context was it that

2  you heard it?

3  A.  That there are officers who have no assigned duty days.

4  Q.  For what purpose?

5  A.  Well, I don't have that assignment.

6  Q.  When you heard in the conversation or the context that

7  there are officers who have assigned duty days, what did you

8  understand that to mean?

9  A.  Like I said, I can take a guess.  But that's not what --

10 Q.  You can only answer that question by guessing, is that your

11 testimony?

12 A.  Considering I don't have that as one of my assignments...

13         THE COURT:  If you want him to guess, go ahead, ask

14 him.  Do you want him to guess?

15 Q.  What do you guess that means?

16 A.  That that officer may handle issues that come up on that

17 day.

18 Q.  Okay.  So what would be the purpose of writing under the

19 word probation the word duty officer by Ms Arango on that date?

20         MS COMEY:  Objection, your Honor.

21         THE COURT:  Given his testimony, I don't think you've

22 laid a foundation that he's in a position to know.

23 Q.  That document clearly indicates that Mr. Azzara is to

24 report to 500 Pearl Street and see the Probation duty officer

25 on October 4th, correct?

1    A.  According to this document, yes.

2    Q.  Were you aware that Ms Arango had told him to report to 500

3    Pearl Street on October 4 on September 16?

4    A.  On September 16?

5    Q.  On September 19th, Monday, September 19th.

6    A.  I understood that after I spoke to Mr. Azzara, after I

7    received Jennifer Arango's e-mail.

8    Q.  After you received Ms Jennifer Arango's e-mail you

9    understood clearly that she had told him to return to 500 Pearl

10   on October 4, correct?

11   A.  Yes.

12   Q.  And you understood clearly that he was going to be living

13   in New York City and that's why they were going to reassign a

14   probation officer, correct?  Yes or no.

15   A.  Yes.

16   Q.  And they then, in fact, contacted Mr. Azzara, right?

17   A.  I contacted Mr. Azzara, yes.

18   Q.  You telephoned him?

19   A.  Yes.

20   Q.  You didn't have his cell number, right?

21   A.  I did.

22   Q.  You got it from somebody, correct?

23   A.  Correct.

24   Q.  You got it from Jennifer, right?

25   A.  Correct.

g9niazzh ag               Lerman - cross

1   Q.  She gave it to you, correct?

2   A.  It was in the chronos, yes.

3   Q.  You asked for it, did you not?

4   A.  No.

5   Q.  And you called Azzara, right?

6   A.  Y es.

7   Q.  And at that point in time you told him that you wanted him

8   to come to White Plains.

9   A.  Correct.

10  Q.  And at that point in time, Mr. Azzara in fact indicated:

11  But I've been directed to appear at 500 Pearl Street and I

12  don't have to go back until October 4th, correct?

13  A.  Yes.

14  Q.  And that was based upon Defendant's Exhibit C that had been

15  given to him that same morning.  True or not true?

16          MS COMEY:  Objection.

17          THE COURT:  Sustained.  He's not in a position to

18  mindread like that.

19  Q.  Did you ask Mr. Azzara what was the basis for him saying

20  that to you?

21  A.  Well, I know he reported to the Manhattan office.

22  Q.  Now, did you tell him that you wanted him to come to White

23  Plains on the 16th, excuse me, on the 20th, Tuesday the 20th,

24  the next day?

25  A.  Yes.

g9niazzh ag                    Lerman - cross

1   Q.  And after that conversation, that cellphone conversation

2   when you called his cellphone, did you receive a copy of an

3   e-mail that he had sent to Jennifer Arango at approximately

4   6:59 in the morning?

5   A.  That e-mail was forwarded to me, yes.

6           MR. LEWIS:  I believe I'm up to Exhibit D.  With your

7   Honor's permission, I'd hand up to the witness a two-page

8   document which is 3502, pages 7 and 8 are now marked as

9   Defendant's Exhibit D.

10          THE COURT:  Okay.  Go ahead.

11  Q.  Is that the e-mail that you received from Jennifer Arango

12  at 9:55 on the morning of September 20th?

13  A.  Yes.

14          MR. LEWIS:  I'd offer this, your Honor, as Defendant's

15  Exhibit D.

16          MS COMEY:  No objection.

17          (Defendant's Exhibit D received in evidence)

18  Q.  So your colleague, an employee of the Probation Department,

19  writes to you at 9:55 that morning and says:  "Good morning,

20  guys.  Just a heads-up.  Below is the e-mail I received from

21  Azzara.  I did advise him that Jason will be contacting him

22  based on his unstable living situation.  As you can see, he

23  keeps saying that he does not want to live in Rockland.  I'm

24  not sure if he will show up at New York City or White Plains

25  today around eleven a.m.  His photo has been updated to PAX."

1  I will keep you updated if he does report, thanks.  And

2  attached thereto is an e-mail from Mr. Azzara, correct?

3  A.  It appears to be, yes.

4  Q.  And it reads, dear Mr. --

5       THE COURT:  Do we need to read it?  It's in the record

6  and I have it and I've read it.

7  Q.  So that particular e-mail you received and then in response

8  to it, what do you do?

9  A.  At that time I believe I forwarded this e-mail to my

10 supervisor.

11 Q.  That's Mr. Johnson?

12 A.  Correct.

13 Q.  Mr. Johnson, did he give you any directions as far as

14 filing papers with the court, as far as a summons to change

15 Mr. Azzara's conditions of supervised release?

16 A.  We were previously looking to modify his conditions, yes.

17 Q.  And that was before he was even released from jail.

18 A.  Correct.

19 Q.  You wanted to modify his conditions based upon the

20 conversations that had occurred with the United States Marshals

21 Service, right?

22 A.  No.

23 Q.  You didn't want to -- well, withdrawn.  One of the

24 conditions that you want to modify was that he was not allowed

25 in Manhattan, correct?

1    A.   Yes.

2    Q.   And the reason why you wanted to modify his conditions to

3    keep him out of Manhattan was because that's where the Chief

4    Judge is, right?

5    A.   That was a concern, yes.

6    Q.   Did there come a time later that day where another e-mail

7    was sent by Mr. Azzara to Ms Arango?

8    A.   I only saw this e-mail.

9    Q.   I'd like to show you what's been marked as Government's

10   Exhibit 3.  Tell me when you finished looking at that.

11            (Pause)

12   A.   Okay.

13   Q.   You've seen that before.

14   A.   No, I haven't.

15   Q.   Is it your testimony that you were never aware that

16   Mr. Azzara sent a second e-mail to Ms Arango on September 20,

17   2016?

18   A.   Yes.  I did not receive this e-mail.

19            MR. LEWIS:  I'd offer this, your Honor, as Defendant's

20   Exhibit, excuse me, as Government's Exhibit 3 I believe it's

21   marked.

22            MS COMEY:  We have no objection.

23            (Government's Exhibit 3 received in evidence)

24   Q.   That particular e-mail indicates that Mr. Azzara wanted to

25   find out from Ms Arango who your supervisor was, right?

1          MS COMEY:  Objection, your Honor.

2          THE COURT:  It speaks for itself.  Plus he says he

3   never saw it before.

4          MR. LEWIS:  May I have a moment.

5          THE COURT:  Yes.

6          (Counsel consults with his client)

7          MR. LEWIS:  No further questions, your Honor.

8   REDIRECT EXAMINATION

9   BY MS COMEY:

10  Q.  Officer Lerman, do you remember being asked about a duty

11  officer on cross-examination?

12  A.  Yes.

13  Q.  Is this generally the practice of the Probation Office to

14  just assign a generic duty officer without a name to somebody

15  on supervised release?

16         MR. LEWIS:  Objection.

17         THE COURT:  Based on his experience, he can answer it.

18  I take that back.  He said he didn't know what a duty officer

19  was.

20  Q.  Have you in your experience as a probation officer ever

21  heard of a duty officer generally being assigned to supervise

22  somebody who is on supervised release?

23         MR. LEWIS:  Judge, he indicated he didn't know what a

24  duty officer is.

25         THE COURT:  He did say that.  I don't know how he

1   could answer that question.

2   Q.  In your experience as a probation officer, have you ever

3   known anyone other than a specifically named probation officer

4   to supervise someone on supervised release?

5   A.  I don't know.

6   Q.  Have you ever heard of that happening?

7           MR. LEWIS:  Objection, asked and answered.

8           THE COURT:  No, he can answer it.

9   A.  It may happen.  I just don't know.

10          THE COURT:  Do you have any personal knowledge of it

11  ever happening?  Not whether or not it may happen.  Do you have

12  any knowledge based on your experience that that's happened?

13  A.  No.

14  Q.  I'd like to turn to Government's Exhibit 1.  Do you still

15  have that in front of you?

16  A.  Yes.

17  Q.  According to this document, on what day did Mr. Azzara's

18  supervised release begin?

19  A.  September 16, 2016.

20  Q.  So does that mean that the conditions in this document

21  apply to him on September 16, 2016?

22  A.  Yes.

23  Q.  I'd like to take a look at condition number 3.  Would you

24  read that aloud, please.

25  A.  "The defendant shall answer truthfully ly all inquiries by

g9niazzh ag                    Lerman - redirect

1   the probation officer and follow the instructions of the

2   probation officer."

3   Q.  What's your understanding of what is required under that

4   condition?

5   A.  That the defendant cannot lie to a probation officer and

6   should follow instructions that are given to him.

7   Q.  You were asked about condition number 6 as well on

8   cross-examination.  What's your understanding of what condition

9   number 6 requires?

10  A.  Okay.  He's supposed to give us ten days notice prior to

11  him moving to an address.

12              (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25